## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| A.G., by and through her father, N.G., | : | Case No. 1:18-cv-300 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| COMMUNITY INSURANCE | : | |
| COMPANY D/B/A/ ANTHEM BLUE | : | |
| CROSS AND BLUE SHIELD, | : | |
| | : | |
| Defendant. | : | |

## ORDER RESOLVING CROSS-MOTIONS FOR
## JUDGMENT ON THE ADMINISTRATIVE RECORD (Docs. 36, 38)

This civil action is before the Court upon Defendant Community Insurance

Company d/b/a/ Anthem Blue Cross Blue Shield ("Anthem" or "Defendant")'s motion

for judgment on the administrative record (Doc. 36); Plaintiff's motion for entry of

judgment on the merits (Doc. 38)[1]; and the parties' responsive memoranda (Docs. 39,

40).

---

[1] While Plaintiff's motion is titled as one seeking "entry of judgment on the merits," the motion is essentially one for judgment on the administrative record.

1

# I. PROCEDURAL HISTORY

On May 1, 2018, Plaintiff A.G., by and through her father, N.G.,[2] filed this Employee Retirement Income and Security Act ("ERISA") action arising from Anthem's decision to deny health plan benefits for allegedly medically necessary services. (Doc. 1). Plaintiff's four-count complaint challenged Anthem's benefit determinations for her treatment at Blue Ridge Therapeutic Wilderness ("Blue Ridge") and Sunrise Residential Treatment Center ("Sunrise"). On January 28, 2019, this Court granted Defendant's partial motion to dismiss Counts 1–3,[3] which pertained to Anthem's benefit determination for A.G.'s treatment at Blue Ridge. (Doc. 28). The only remaining cause of action—Count 4—seeks benefits for A.G.'s treatment at Sunrise under 29 U.S.C. § 1132(a)(1)(B). (Doc. 1 at ¶¶ 54–62).

---

[2] During the relevant time period, N.G. and A.G. was an insured by Anthem through N.G.'s employer-sponsored health insurance. (*Id.* at ¶ 7) A copy of the insurance plan issued to N.G. by Anthem is attached to the Complaint. (Doc. 1-2 (the "Plan")).

[3] Count 1 was brought on behalf of A.G. and a proposed class, and sought enforcement of the Plan because Plaintiff contended that the services received at Blue Ridge were not excluded under the Plan. Count 2 sought enforcement of the Plan for breach of the protections of the Mental Health Parity and Addiction Act ("Parity Act"), which mandates parity between the "treatment limitations" placed on mental health benefits and medical/surgical benefits. (Doc. 1 at ¶¶ 40–48; 29 U.S.C. § 1185a (a)(3)(A)(ii)). Count 3 was for breach of fiduciary duty for violation of the Parity Act. (Doc. 1 at ¶¶ 49–53).

## II.     BACKGROUND FACTS[4]

### A.  The Plan

The Plan's Health Certificate of Coverage (the "Certificate") governs whether
benefits are covered by Anthem.  (DPUF at ¶ 2).  If a service is covered by the terms of
the Certificate (a "Covered Service"), the Plan provides benefits for the service.  (*Id* at
¶¶ 2,3). Covered Services must be (1) "Medically Necessary," (2) within the scope of the
license of the "Provider" performing the service, (3) rendered while coverage is in effect,
(4) not "Experimental/Investigative: or otherwise excluded by the Plan, and (5)
authorized in advance when Anthem requires this procedure.  (AG_ANTHEM_000114).

"Medically Necessary" means (1) appropriate for and consistent with symptoms
and proper diagnosis and treatment; (2) obtained from a Provider; (3) provided in
accordance with applicable medical and/or professional standards; (4) known to be
effective in materially improving health outcomes; (5) the "most appropriate supply,
setting or level of service that can be safely provided to the Member and which cannot be
omitted consistent with recognized professional standards of care (which, in the case of

---

[4] To supplement its motion for judgment on the administrative record, Defendant filed a Statement of
Proposed Undisputed Facts.  (Doc. 37, hereinafter "DPUF").  While the Standing Order of the Court
requires parties to file statements of proposed undisputed facts to accompany motions for summary
judgment, those rules pertain to motions filed pursuant to Federal Rule of Civil Procedure 56.  Yet
motions for judgments on the administrative record are "not contemplated by the Federal Rules of Civil
Procedure." *Zurndorfer v. Unum Life Ins. Co. of Am.*, 543 F. Supp. 2d 242, 255 (S.D.N.Y. 2008).
Therefore, under the Standing Order of the Court, parties are not required to file statements of proposed
undisputed facts in support of motions for judgment on the administrative record.  Nevertheless, the
Court's statement of facts references Defendant's Statement of Proposed Undisputed Facts that are
undisputed by the parties and confirmed by the Court upon review of the citations to the administrative
record.  The administrative record was filed by Defendant Anthem (Doc. 35), and references to the
administrative record will be referred to by the Bates numbers.

3

hospitalization, also means that safe and adequate care could not be obtained in a less comprehensive setting);" (6) cost-effective compared to alternative interventions; (7) not Experimental/Investigative; (8) not primarily for the convenience of the Member; and (9) not otherwise excluded. (AG_ANTHEM_000116–17). The Plan states that the "fact that a Provider may prescribe, order, recommend, or approve care, treatment, services or supplies does not, of itself, make such cares, treatment or supplies Medically Necessary or a Covered Service and **does not** guarantee payment." (AG_ANTHEM_000117).

The Plan grants Anthem "complete discretion to determine the administration of [Members'] benefits." (AG_ANTHEM_000112). Anthem's discretion includes "whether the services, care, treatment, or supplies Medically Necessary" and "all questions arising under the Certificate. (AG_ANTHEM_000112–13). In determining whether services are Medically Necessary, Anthem uses "clinical coverage guidelines, such as medical policy, clinical guidelines, and other applicable policies and procedures to assist in making [its] Medical Necessity decisions." (AG_ANTHEM_000090).

The Plan includes a Utilization Review process to determine whether services are Medically Necessary. The Certificate provides:

> Utilization Review aids the delivery of cost-effective health care by reviewing the use of treatments and, when proper, level of care and/or the setting or place of service that they are performed. A service must be Medically Necessary to be a Covered Service. When level of care, setting or place of service is part of the review, services that can be safely given to you in a lower level of care or lower cost setting / place of care, will not be Medically Necessary if they are given in a higher level of care, or higher cost setting / place of care.

> Certain Services must be reviewed to determine Medical Necessity in order
> for you to get benefits.  Utilization Review criteria will be based on many
> sources including medical policy and clinical guidelines.  Anthem may
> decide that a service that was asked for is not Medically Necessary if you
> have not tried other treatments that are more cost effective.

(AG_ANTHEM_000088).

As part of the Utilization Review, Anthem offers Pre-service Review, Precertification, Continued Stay / Concurrent Review, and Post-service Review. (AG_ANTHEM_000089).  Pre-service Review is "[a] review of a service, treatment or admission for a benefit coverage determination which is done before the service or treatment begins or admission date."  (*Id.*).  Precertification is "[a] required Pre-service Review for a benefit coverage determination for a service or treatment" that "will include a review to decide whether the service meets the definition of Medical Necessity" under the Certificate.  (*Id.*).  "Certain services require Precertification in order for [the insured] to get benefits."  (*Id.*).  The Plan also offers urgent reviews, which "are conducted under a shorter timeframe than standard reviews," where appropriate.  (*Id.*).

When receiving treatment from a Non-Network Provider, Members must get Precertification when required.  (AG_ANTHEM_000090).  The Plan directs Members to contact Anthem "to be sure that Prior Authorization and/or precertification has been obtained."  (AG_ANTHEM_000077).  When services are rendered by a Non-Network Provider and a Member has not received Precertification or Pre-service Review, the insured is responsible for "[s]ervices that are not Medically Necessary[.]" (AG_ANTHEM_000079, 90).

The Plan provides benefits for behavioral/mental health Covered Services at different levels of care, including "Inpatient Services," "Residential Treatment," "Outpatient Services" like "Partial Hospitalization Programs" and "Intensive Outpatient Programs," and "Online Visits." (AG_ANTHEM_000026).

Residential Treatment must be provided in a licensed "Residential Treatment Center" that offers individualized and intensive treatment that includes observation and assessment by a physician weekly or more often and rehabilitation, therapy, and education. (*Id.*). The Plan defines a Residential Treatment Center as:

> A Provider licensed and operated as required by law, which includes:
>
> 1. Room, board and skilled nursing care (either an RN or LUN/LPN) available on-site at least eight hours daily with 24 hour availability;
>
> 2. A staff with one or more Physicians available at all times.
>
> 3. Residential treatment takes place in a structured facility-based setting.
>
> 4. The resources and programming to adequately diagnose, care and treat a psychiatric and/or substance use disorder.
>
> 5. Facilities are designated residential, subacute, or intermediate care and may occur in care systems that provide multiple levels of care.
>
> 6. Is fully accredited by The Joint Commission (TJC), the Commission on Accreditation of Rehabilitation Facilities (CARF), the National Integrated Accreditation for Healthcare Organizations (NIAHO), or the Council on Accreditation (COA).

(AG_ANTHEM_000121–22).

6

Regarding types of Outpatient Services, a Partial Hospitalization Program is defined as "[s]tructured, short-term behavioral health treatment off that offers nursing care and active treatment in a program that operates no less than 6 hours per day, 5 days per week." (AG_ANTHEM_000118). An Intensive Outpatient Program is defined as "[s]hort-term behavioral health treatment that provides a combination of individual, group and family therapy." (AG_ANTHEM_000116).

During the relevant time period, Anthem Used Clinical UM Guideline CG-BEH-03H (the "Guideline")[5] to assist in determining "medical necessity for levels of care relating to psychiatric disorder treatment." (AG_ANTHEM_001031–47). The Guideline provides the following criteria for Residential Treatment Centers:

> Residential treatment center is considered **medically necessary** when the member has **all** of the following:
>
> A. The Member is manifesting symptoms and behaviors which represent a deterioration from the Member's usual status and include either self injurious or risk taking behaviors that risk serious harm and cannot be managed outside of a 24 hour structured setting or other appropriate outpatient setting; **and**
>
> B. The social environment is characterized by temporary stressors or limitations that would undermine treatment that could potentially be improved with treatment while the member is in the residential facility; **and**
>
> C. There should be a reasonable expectation that the illness, condition or level of functioning will be stabilized and improved and that a short term, subacute residential treatment service will have a likely benefit on

---

[5] The Guideline includes a list of references upon which it is based, including two peer reviewed publications, and eight government agency, medical society, and other publications, including, relevantly, the American Academy of Child & Adolescent Psychiatry, the American Psychiatric Association, the American Society of Addiction Medicine, the Association for Ambulatory Behavioral Health Care, and the Diagnostic and Statistical Manual of Mental Disorders (5th Ed.). (*See* AG_ANTHEM_001044–45).

the behaviors/symptoms that required this level of care, and that the member will be able to return to outpatient treatment; **and**

D.  Member's clinical condition is of such severity that an evaluation by physician or other provider with prescriptive authority is indicated at admission and weekly thereafter.

(AG_ANTHEM_001032–33).

The Guideline includes several criteria for whether a Partial Hospitalization Program is Medically Necessary, including the following:

The [M]ember is not imminently dangerous to self or others and is able to exercise adequate control over his/her behavior to function outside of 24 hour custodial care.  However, the member may exhibit some identifiable risk for harm to self or others yet is able to develop and practice a safety plan with the structured intensive support of PHP treatment.

(AG_ANTHEM_001033–34).

The Guideline includes several criteria for whether an Intensive Structured Outpatient Program ("IOP") is Medically Necessary, including "the clear potential to regress further without specific IOP services," and "[t]he need for direct monitoring less than daily but more than weekly[.]"  (AG_ANTHEM_001034–35).

## B.  A.G.'s Treatment

A.G. struggled for years with mental health issues such as depression, anxiety, eating disorders, suicide ideations, and drug use.  (Doc. 1 at ¶ 10).  In December 2016, after a breakup with her boyfriend, A.G. cut her left forearm and sent a picture of her forearm to her ex-boyfriend.  (DPUF at ¶ 24).  A.G. stated that "she was using the self-harm to get her boyfriend's attention.  (*Id.*).

### 1. Ridgeview

The next day, A.G. was admitted to Ridgeview Institute ("Ridgeview"), a private hospital treating patients with addiction and mental health problems.  (*Id.*)  While at Ridgeview, A.G. "worked on developing triggers that have led to impulsive and unhealthy behaviors."  (AG_ANTHEM_000711).  Providers at Ridgeview reported that A.G. was able to "process what coping skills would be beneficial in helping [her] abstain from giving into impulses."  (*Id.*).  A.G. was discharged from Ridgeview on January 6, 2017.  (*Id.*).  In A.G.'s discharge recommendations, her case manager provided "the strong recommendation for [A.G.] to enter outpatient therapy with a therapist on a weekly basis," and "outpatient therapy with a psychiatrist so he/she can manage all medication and symptoms on a monthly basis."  (*Id.*).

### 2. Blue Ridge

On the day she was discharged from Ridgeview, A.G. enrolled at Blue Ridge.  (*Id.* at ¶ 27).  A.G. obtained treatment at Blue Ridge from January 6, 2017 through March 30, 2017.  (*Id.*).

On February 17, 2017, Blue Ridge prepared a psychological assessment report for A.G.  (*Id.* at ¶ 28).  In the assessment, A.G. stated that she has "struggled with depression" since she was 15, she had some self-harming behavior that began when she was 15 years, but she had not engaged in any self-harming behaviors for one year prior to the December 2016 incident.  (*Id.* at ¶ 29). A.G. reported that "she is dedicated to schoolwork and has maintained good grades" and "describes herself as very confident in

herself and her abilities." (*Id.* at ¶ 28). Additionally, her mother reported that A.G. was "likeable, charming," "has a great work ethic, [and] is dedicated to school." A.G. denied that she had any traumatic events in her life, or that she had any history of physical, sexual, or emotional abuse. (*Id.* at ¶ 31). A.G. denied "having a history of obsessive thoughts, compulsive behaviors, racing thoughts, homicidal thoughts, manic episodes, hallucinations, paranoia, grandiose ideations, or eating-disordered behaviors." (*Id.*). Regarding substance abuse, the assessment states that A.G. "identified emotional and social triggers and risk factors related to drug and alcohol relapse." (*Id.* at ¶ 36). Additionally, the assessment stated that A.G. "remained drug and alcohol free during her stay in Blue Ridge's program" and "expresses a desire to remain abstinent from drugs and alcohol in the future." (*Id.*) The assessment also found that A.G. had improved "in her ability to appropriately and assertively communicate with her parents, and to have healthier interactions." (*Id.* at ¶ 37).

In Blue Ridge's discharge recommendations, a clinician found that A.G. "was genuinely motivated to make progress at Blue Ridge[.]" (AG_ANTHEM_000715). Yet the clinician noted that she "remain[ed] very concerned regarding her risk for relapsing in the areas of conduct problems, social difficulties, depressive symptoms, anxiety, substance abuse if she were to return to her home environment after completing [Blue Ridge's] program." (*Id.*). The clinician "strongly recommended" that A.G. "go directly from Blue Ridge to her next placement." She stated that "[r]eturning home, even for a few days, would place [A.G.] at great risk for a regression in functioning and would undo

10

much of the progress that she has made at Blue Ridge[.]" (*Id.*).  A Blue Ridge clinical

psychologist also stated that if A.G. "does not receive additional treatment, the potential

for these problems to become worse is significant."  (AG_ANTHEM_000709).

### 3. Sunrise

A.G. was admitted to Sunrise on March 30, 2017, the same day she left Blue

Ridge.  (DPUF at ¶ 39).  Sunrise, a residential treatment center in Hurricane, Utah, is a

Non-network Provider under the Plan.  (*Id.*).  Plaintiff did not seek precertification of

benefits at Sunrise for A.G. prior to her admission to Sunrise.  (*Id.*).

On April 3, 2017, a psychiatric evaluation for A.G. was completed by a Sunrise

psychiatrist.  (*Id.* at ¶ 41).  Regarding A.G.'s mental status, the psychiatrist wrote:

> She is pleasant, dressed appropriately, looks her stated age, denies suicidal
> ideation or self harm thoughts, has some feelings of hopelessness and
> helplessness, does feel ok being at Sunrise, thoughts are organized, logical
> and goal directed, no delusional thinking, denies auditory and visual
> hallucinations, oriented x 4, memory intact for recent and remote,
> appropriate responses to similarities and proverbs, intellectual level
> estimated to be in the high normal area, judgment is good, insight is
> present.

(AG_ANTHEM_000741).  The psychiatrist diagnosed A.G. with "Major Depression,

Polysubstance Use Disorder."  (*Id.*).  The psychiatric evaluation included the plan to taper

A.G. off of her medications.  (*Id.*).

On April 12, 2017, a Sunrise social worker completed a psychosocial assessment

on A.G.  (AG_ANTHEM_000721).  The psychosocial assessment stated that the reason

for referral/presenting problems was A.G.'s "[r]elapse of self-harming behaviors, use of

substances including meth, depression, anxiety, excessive shame thoughts."  (*Id.*)  A.G.'s

11

parents' expectations for treatment was reported as "wanting [A.G.] to build self-worth, and be comfortable with herself.  They want her to see how she does not need friends to have self-worth."  (*Id.*).  A May 1, 2017, a psychiatric note stated that A.G. "seems to be doing quite well" and wanted to taper off her antipsychotic medication.  (AG_ANTHEM_000719).  The psychiatric note further states that A.G. "looks good today, mood seems stable, affect is appropriate, denies self harm thoughts, has been at Sunrise about 45 days and feels that it is a good fit for her."  (*Id.*)

Sunrise created a Master Treatment Plan for A.G on May 1, 2017.  (DPUF at ¶ 44).  The treatment plan diagnosed A.G. with "Major Depressive Disorder, Recurrent, Moderate," "Generalized Anxiety Disorder with Panic Attacks," "Cannabis Use Disorder, mild, in a controlled environment," "Substance Use Disorder, in early remission," and "Parent-child relational problem."  (AG_ANTHEM_000734).  The Master Treatment Plan listed several objectives for A.G. to address her depression, anxiety, and substance abuse.  (AG_ANTHEM_000734–37).  A treatment team note entered on April 27, 2017, before the Master Treatment Plan was issued, listed the nine objectives as "ongoing." (AG_ANTHEM_000726–31).  An August 31, 2017 treatment team note stated that A.G. had completed her first objectives for her depression, anxiety, and substance use on August 9, 2017.  (AG_ANTHEM_000724–25).  A September 28, 2017 treatment team note reported that A.G. had competed her second objectives for her depression, anxiety, and substance abuse on September 10, 2017.  (AG_ANTHEM_000722–23).

### C. Benefits Determination

On March 31, 2017, Anthem received Plaintiff's initial benefits request for A.G.'s treatment at Sunrise from March 30, 2017 to April 12, 2017. (ANTHEM_AG_000425–26, 435). To review A.G.'s benefits claim, Anthem UM Services, Inc. ("Anthem UM")—which provides utilization management services for Anthem—engaged Dr. Charlisa Allen, M.D., a board-certified psychiatrist. (*Id.*, AG_ANTHEM_000890–91). In conducting the review of A.G.'s claim, Dr. Allen reviewed A.G.'s psychiatric treatment history and conducted a telephonic conference with the attending physician at Sunrise on April 4, 2017. (AG_ANTHEM_000890–91). Dr. Allen found that A.G.'s treatment at Sunrise was not Medically Necessary because she "does not have severe medical issues or severe risky, agresssive [sic], or threatening psychiatric issues which would require 24 hr [residential treatment center] level of care" and that her "[m]ental health symptoms were not severe[.]" (*Id.*). Dr. Allen further found that A.G. did not exhibit psychosis or self-harm ideation, and was not suffering from any substance abuse issues because of her multi-month stay in a wilderness program. (*Id.*). Dr. Allen further noted that the treatment A.G. was receiving at Sunrise could be provided in a Partial Hospitalization Program—which is a lower level of care than a Residential Treatment Center—but Sunrise declined. (*Id.*). Based on these findings, Dr. Allen recommended denying coverage as not Medically Necessary. (*Id.*).

On April 5, 2017, Anthem UM submitted a letter denying coverage for A.G.'s requested benefits for her treatment at Sunrise from March 30, 2017 to April 12, 2017,

13

finding that the treatment was not Medically Necessary under the Plan. The letter was sent to A.G.; Dr. Cantril, a physician at Sunrise; and the insurance verifier at Sunrise of Anthem's benefit determination. (AG_ANTHEM_000425–29, 509–13, 518–22). The first page of the letter states:

> Based on the review of the information provided to us, the service referenced above is not medically necessary, as that term is defined under your health benefit plan. Services which are not medically necessary are a benefit exclusion and therefore not a covered benefit.

The second page of the letter[6] states that Anthem's physician consultant concluded the following:

> A request was made for you to receive residential treatment for your mental health condition. The plan criteria considers short-term residential treatment medically necessary for those who meet all the following: 1) their behaviors have worsened and risk serious harm to themselves or others; 2) the behaviors or actions cannot be managed outside of a 24 hour structured setting; 3) their living situation keeps them from getting needed treatment; and 4) improvement can be expected from a short-term residential stay. The information we have does not show your behavior is putting you at risk for serious harm or 24 hour structured care is needed. For those reasons, the request is denied as not medically necessary. There may be other treatment options to help you, such as partial hospital or intensive outpatient services. You may want to discuss these with your doctor. It may help your doctor to know we reviewed the request using the plan clinical guideline called Psychiatric Disorder Treatment Residential Center (RTC) CG-BEH-03.

(AG_ANTHEM_000426, 510, 519; *see also* AG_ANTHEM_000892).

---

[6] Plaintiff contends that there is no evidence that A.G. ever received the second page of the letter that is included in the Administrative Record, which contains information behind Anthem's denial. (Doc. 38-1 at 4–5). Yet the Court need not weigh in on whether or not Plaintiff received the second page of the denial letter because, as Defendant notes, Plaintiff has not alleged that Anthem failed to provide a full and fair review of Plaintiff's claim. (Doc. 39 at 8). Moreover, it is not in dispute that the second page of the denial letter reflects the findings of Dr. Allen that A.G.'s treatment at Sunrise was not medically necessary, which is the core issue in this matter. (AG_ANTHEM_000890–92).

On October 4, 2017,[7] Patricia Gish, from the Mental Health Autism Insurance Project, submitted a level one appeal of Anthem's benefit determinations for A.G.'s Residential Treatment. (AG_ANTHEM_001048–61). In accordance with the Plan, Anthem engaged Dr. Jessica Chaudhary, a board-certified psychiatrist, to review A.G.'s claim. (AG_ANTHEM_000449, 892). In her review, Dr. Chaudry noted that A.G. had improved considerably during her time at Blue Ridge, but the Blue Ridge physicians believed that residential treatment was necessary for ongoing chronic, passive suicidal ideation. (AG_ANTHEM_000892). Dr. Chaudry emphasized that there was no noted active suicidal ideation, no aggression or agitated behaviors, and that A.G.'s family was involved. (*Id.*). For those reasons, Dr. Chaudry concluded that A.G.'s treatment could have safely occurred at a lower level of care, and therefore concluded that A.G.'s treatment was not a Covered Service because it was not Medically Necessary. (*Id.*).

On October 30, 2017, Anthem UM sent a letter to A.G. upholding the denial of benefits for A.G.'s residential treatment at Sunrise. (ANTHEM_AG_000881–89). The letter stated:

> We reviewed all the information that was given to us before with the first request for coverage. We also reviewed all that was given to us for the appeal. Your doctor wanted you to have residential treatment center care. The reason we were given for this was that you were at risk for serious harm without 24 hour care. We understand that you would like us to change our first decision. Now we have new information from the medical record. We still do not think this is medically necessary for you. We believe our first decision is correct for the following reason. You were not at risk for

---

[7] Plaintiff states that her appeal was submitted on September 28, 2017 (Doc. 38-1 at 5), yet the Administrative Record reflects that the appeal was submitted on October 4, 2017. (AG_ANTHEM_ 001243). Defendant notes that it "processed the appeal, even though the appeal may have been untimely." (Doc. 39 at 8).

serious harm that you needed 24 hour care. You could have been treated
with outpatient services.

(AG_ANTHEM_000881–82).

After Anthem upheld the denial of benefits for A.G.'s residential treatment at

Sunrise, A.G. had fully exhausted the Plan's internal appeal process.  Subsequently,

Plaintiff filed this action challenging Defendant's denial of benefits.[8]

## III.    STANDARD OF REVIEW

This Court reviews *de novo* a denial of benefits under an ERISA plan "unless the

benefit plan gives the plan administrator discretionary authority to determine eligibility

for benefits or to construe the terms of the plan." *Univ. Hosps. v. Emerson Elec. Co.,* 202

F.3d 839, 845 (6th Cir.2000) (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101,

115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). If an administrator has such discretionary

authority, the Court reviews the denial of benefits under the arbitrary and capricious

standard. *Firestone,* 489 U.S. at 111.

As the Court noted in its Order on Defendant's partial motion to dismiss, "it is

undisputed that Anthem had full discretionary authority to interpret the Plan."  (Doc. 16

at 8).   Thus, the arbitrary and capricious standard applies.

Therefore, Plaintiff "bears the burden of proving that the Plan Administrator's

decision was arbitrary or capricious; otherwise, the decision of the Plan Administrator

---

[8] On January 22, 2018, Anthem also sent Plaintiff a letter denying a request for benefits at Sunrise for
dates of service between October 1, 2017 and November 2, 2017.  (AG_ANTHEM_000417–24).  Anthem
rejected Plaintiff's request for her treatment at Sunrise over this time period finding, again, that the
services were not Medically Necessary.

'must be sustained as a matter of law.'" *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011) (quoting Gardner v. Central States, Se. and Sw. Areas Pension Fund, et al., 14 F.3d 601 (table), No. 93–3070, 1993 WL 533540, at *3 (6th Cir. Dec. 21, 1993)). In determining whether the administrator's decision was arbitrary and capricious, the Court "may consider only the evidence available to the administrator at the time the final decision was made." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014).

Nonetheless, merely because the review is deferential does not mean that the court must rubber-stamp the administrator's decisions. *McDonald v. Western–Southern Life Ins. Co.,* 347 F.3d 161, 172 (6th Cir.2003). The administrator's decision must be upheld, however, if "the record evidence offers a reasoned explanation for the decision." *Mechley v. Proctor & Gamble,* No. C–1–06–538, 2008 U.S. Dist. LEXIS 116306, at *5, 2008 WL 2796728 (S.D. Ohio July 17, 2008) (citing *Davis v. Kentucky Fin. Cos. Ret. Plan,* 887 F.2d 689, 693 (6th Cir.1989)). "Even if the Court would not have come to the same conclusion as the Plan Administrator, as long as there is a reasonable basis for the decision, it must be upheld." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005).

## IV. ANALYSIS

The issue before the Court is simple: whether Anthem's determination that Plaintiff's treatment at Sunrise was not Medically Necessary was arbitrary and capricious. Based on the Administrative Record, it is clear that Anthem's benefits denial

was not arbitrary and capricious.

The Court must uphold Anthem's benefits denial as long as the record evidence offers a reasoned explanation for its denial. Here, Anthem contends that its finding that Residential Treatment was not Medically necessary was supported by 1) A.G.'s treating provider at Ridgeview recommending that she enter outpatient therapy, a lower level of care than residential treatment; 2) A.G.'s providers at Blue Ridge and Sunrise recognizing that A.G. was improving throughout her treatment; and 3) two board-certified psychiatrists separately concluding that A.G. could safely be treated at a lower level of care than residential treatment. (*See* Doc. 39 at 9–10).

Plaintiff contends that Anthem's decision was arbitrary and capricious because A.G.'s treating physicians at Blue Ridge and Sunrise both found 24-hour residential treatment for A.G. was Medically Necessary.[9] (Doc. 38-1 at 8–13). However, the "fact that a Provider may prescribe, order, recommend, or approve care, treatment, services or supplies does not, of itself, make such cares, treatment or supplies Medically Necessary or a Covered Service and **does not** guarantee payment." (AG_ANTHEM_000117). While providers at Blue Ridge and Sunrise did consider Residential Treatment to be Medically Necessary, providers at Ridgeview did not. Tellingly, Plaintiff completely

---

[9] The primary case Plaintiff relies on, *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538 (6th Cir. 2015), is largely inapposite. *Shaw* relates to a plan administrator's benefits determination regarding a disability claim, which is a different analysis than a mental health claim. 795 F.3d at 547. Moreover, the Court is persuaded by Defendant's brief that *Shaw* is also factually distinguishable from this case. (*See* Doc. 39 at 13–15).

ignores that A.G.'s case manager at Ridgeview recommended that A.G. at an outpatient facility, not a residential treatment center.

Ridgeview's determination that A.G. should be treated at a lower level of care than a Residential Treatment Center is itself virtually dispositive, as it shows that Anthem's determination was not arbitrary and capricious because Anthem was relying on the medical opinions of A.G.'s providers. *See Brown v. Fed. Exp. Corp.*, 610 F. App'x 498, 505 (6th Cir. 2015) ("[W]hen a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, this decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision."). Nevertheless, if Plaintiff could point to evidence that A.G.'s condition deteriorated after Ridgeview recommended a lower level of care, then Anthem's reliance on the Ridgeview providers' findings could potentially be construed as arbitrary and capricious. But that is not the case. Here, there Administrative Record reflects— and Plaintiff concedes (*see* Doc. 38-1 at 9–11) — that A.G. continued the progress she made at Ridgeview during her time at both Blue Ridge and Sunrise. Therefore, because it was reasonable—based on substantial evidence in the record—to conclude that A.G.'s symptoms and behaviors were not deteriorating and that A.G. could have been safely treated at a lower level of care, Anthem did not arbitrarily and capriciously conclude that A.G.'s treatment at a Sunrise was not Medically Necessarily.

Accordingly, Defendant's motion for judgment on the administrative record is well-taken, and Plaintiff's motion fails as a matter of law.

### V.    CONCLUSION

For the foregoing reasons,

1) Defendant's motion for judgment on the administrative record (Doc. 36) is **GRANTED.**

2) Plaintiff's motion for judgment on the merits (Doc. 38) is **DENIED**.

**3)** The Clerk shall enter judgment accordingly, whereupon this case is **TERMINATED** from the docket of this Court.

**IT IS SO ORDERED.**

Date:  11/30/2020                                    */s/ Timothy S. Black*
                                                    Timothy S. Black
                                                    United States District Judge